Filed 4/26/16  Brentwood Stakeholders Alliance for Better Living v. City of Los Angeles CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| BRENTWOOD STAKEHOLDERS ALLIANCE FOR BETTER LIVING AND SENSIBLE PLANNING et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Respondent; <br><br> MONTANA BUNDY, LLC, <br><br> Real Party in Interest and Respondent. | B263037 <br> (Los Angeles County <br> Super. Ct. No. BS149514) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas I. McKnew, Jr., Judge.  Affirmed.

Gaines & Stacey, Fred Gaines and Lisa A. Weinberg for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Timothy McWilliams, Assistant City Attorney, Siegmund Shyu, Deputy City Attorney, and Monica D. Castillo, Deputy City Attorney, for Defendant and Respondent.

Jeffer Mangels Butler & Mitchell, Benjamin M. Reznik and Matthew D. Hinks for Real Party in Interest and Respondent.

# I.  INTRODUCTION

Plaintiffs, Brentwood Stakeholders Alliance for Better Living and Sensible Planning and Regents Properties, LLC, appeal from the March 13, 2015 judgment.  The judgment was entered in favor of defendant, City of Los Angeles (defendant), and real party in interest, Montana Bundy, LLC (the developer).  Plaintiffs challenge the trial court's denial of their mandate petition.  They argue defendant failed to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.)[1] when it approved the tentative tract map.

First, plaintiffs argue defendant adopted the initial mitigated negative declaration, not the final version.  In a related argument, plaintiffs contend defendant was required to prepare an environmental impact report because the project's potential geotechnical, traffic, noise and other impacts are unmitigated.  Second, plaintiffs seek review of defendant's density bonus approval.  Plaintiffs assert defendant failed to procedurally and substantively comply with the density bonus law.  We affirm the judgment.

# II.  BACKGROUND

## A.  The Property and Neighborhood

The developer owns the real property located at 11965-11979 West Montana Avenue in the City of Los Angeles.  Montana Avenue is a designated secondary highway with a dedicated width of 83 feet.  The irregular shaped parcel has an approximate frontage of 151 feet along Montana Avenue and a variable depth ranging from about 157 to 210 feet.  There are two adjacent alleys north and west of the property.

The property was developed in the 1950s with two 2-story apartment buildings with a combined total of 32 dwelling units.  The 2 lots that comprise the property have an

---

[1]     Further statutory references are to the Public Resources Code unless otherwise indicated.

approximate area of 29,453 square feet. The property is zoned R3. Based on the maximum lot area per unit for the R3 zone, the developer has the right to build 36 dwelling units.

Most of the surrounding buildings are multiple-family residential development except for a charter school, a church and a high-rise commercial building. The charter school, Brentwood Science Magnet Elementary School, is located on the property's west side across Bundy Drive. The nearby church and its preschool are adjacent to the west and north of the property. The high-rise office building fronting San Vicente Boulevard is located to the north of the property.

Regent Properties, LLC is a tenant and occupies the second floor of the high-rise office building fronting San Vicente Boulevard. The employees of Regent Properties LLC use one of the alleys adjacent to the developer's property to access the parking garages. Regent Properties is a member of Brentwood Stakeholders Alliance for Better Living and Sensible Planning, an unincorporated association.

B. Project Application

In April 2012, the developer submitted applications to the Department of City Planning (city planning department) for approval of a tentative tract map. The developer requested approval to demolish the two existing apartment buildings and construct a new 49-unit residential condominium with a density bonus (the project). The proposed condominium is a 6-story building over a two-level street and subterranean parking with 105 parking spaces. In support of the applications, the developer submitted to defendant two geotechnical reports prepared by Geotechnologies, Inc. dated October 15, 2007, and March 15, 2012.

The city planning department received letters of approval for the project from: the Bureau of Street Lighting dated June 14, 2012; the Department of Building and Safety, Zoning Section dated June 20, 2012; the Department of Building and Safety, Grading Division dated June 28, 2012; the Fire Department dated June 28, 2012; and the Bureau

3

of Engineering dated July 13, 2012. The Department of Building and Safety, Grading Division's June 28, 2012 soils report approval letter found no liquefaction issue. The soils report approval letter states: "The site is located in a designated liquefaction hazard zone as shown on the 'Seismic Hazard Zones' map issued by the State of California. The Liquefaction study included as part of the previous report demonstrates that the site does not possess a liquefaction potential." In addition, the soils report approval letter incorporates the recommendations made by Geotechnologies, Inc.'s geotechnical reports dated October 15, 2007 and March 15, 2012.

### C. Initial and Revised Mitigated Negative Declarations

On April 12, 2013, defendant filed the initial mitigated negative declaration with the project title of "ENV-2012-1111-MND." On May 1, 2013, defendant received a letter supporting the project from the South Brentwood Residents Association, which represents approximately 7,500 homeowners and renters who reside nearby. On May 8, 2013, defendant held a public meeting on the proposed tract map. After testimony from the public, defendant filed a revised mitigated negative declaration on July 26, 2013. The project title of the July 26, 2013 revised mitigated negative declaration is "ENV-2012-1111-MND."

### D. Final Mitigated Negative Declaration

On October 11, 2013, defendant filed the recirculated, final mitigated negative declaration with the project title of "ENV-2012-1111-MND-REC1." The final mitigated negative declaration was published in the *Los Angeles Times* on October 17, 2013. Copies of the final mitigated negative declaration were mailed to individuals who gave testimony at the public hearing, including Regent Properties, LLC. Pursuant to the city planning department's policy, the final mitigated negative declaration was signed on November 18, 2013, the last day of the 30-day public comment period. Defendant

4

received comments from Daniel Gryczman, the executive vice president of Regent Properties, LLC, via a November 1, 2013 letter .

E.  The City Planning Department's Project Approval

On November 26, 2013, the city planning department approved the mitigated negative declaration, ENV-2012-1111-MND, and tentative tract map, Case No. VTT-71898-CN, subject to various conditions.  As will be noted, the city planning department is also referred to as the advisory agency.  The conditions include requiring the developer to dedicate property along Montana Avenue and the alleys.  The specific conditions from the engineering bureau include:  "That a 3-foot wide strip of land be dedicated along Montana Avenue adjoining the subdivision to complete a 43-foot wide half right-of-way dedication in accordance with Secondary Highway Standards.  [¶]  That 2.5 foot wide strips of land be dedicated along [] both alleys adjoining the tract including 10-foot by 10-foot alley cut corner at the intersection of [] both alleys."  In addition, the developer was required to improve Montana Avenue and the alleys adjoining the property.

In the November 26, 2013 determination letter, the city planning department made findings of fact relating to the California Environmental Quality Act.  The determination letter states in part:  "The Deputy Advisory Agency, certifies that Mitigated Negative Declaration No. ENV-2012-1111-MND reflects the independent judgment of the lead agency and determined that this project would not have a significant effect upon the environment provided the potential impacts identified above are mitigated to a less than significant level through implementation of Condition No(s). 21 and 22 of the Tract's approval."

On January 7, 2014, Michael J. Logrande, defendant's Director of Planning, approved the density bonus in a determination letter.  (Mr. Logrande's determination letter is erroneously dated January 7, 2013.)  The density bonus allows the developer to increase the floor area ratio and the height of the condominium.  The planning director found the project qualified for the density bonus incentives under the affordable housing

5

incentives program. The determination letter states in part: "The applicant is seeking approval of two (2) Density Bonus Incentives as provided by the Los Angeles Municipal Code (LAMC) Section 12.22 A.25(e) for a project that sets aside four (4) required affordable dwelling units. The two incentives are: a 35 percent increase of the maximum permitted floor area ratio [] from required 3:1 to 4.05:1 as defined by Section 12.21.1 A. of the LAMC, and a 22 percent increase in the height requirement, allowing 56 feet in height building envelope at its highest point, and 68 feet maximum height to accommodate the sloping terrain of the project site, as permitted pursuant to Section 12.21.1 B. 2 in lieu of the normally permitted 45 feet. [¶] In accordance with Senate Bill 1818 and Section 12.22 A 25 (Density Bonus provisions) of the Los Angeles Municipal Code (LAMC), in setting aside the mandated four (4) Very Low Income units of the 36 dwelling units base density, for occupation by very-low income households for a period of 30 years, the project qualifies for at least an automatic 35% increase (13 additional dwelling units) in the permitted density." Further, the density bonus provisions of the Los Angeles Municipal Code provided for two parking options that reduced the parking requirements for dwelling units. The developer elected parking option 1, which requires 98 parking spaces, but chose to provide 105 parking spaces.

F. Appeal to the City Planning Commission

On January 9, 2014, Regent Properties, LLC appealed the planning department's approvals of the tentative tract map and density bonus to the City Planning Commission (planning commission). Mr. Gryczman, Regent Properties, LLC's executive vice president, argued: no evidence supported Mr. Logrande's determination concerning the necessity of the density bonus incentives; Mr. Logrande's decision did not reference the recirculated mitigated negative declaration, thus the city planning department adopted the original declaration; there were no environmental reports and technical studies to support the project other than a shade/shadow report; despite numerous verbal and written requests to defendant's staff for copies of the reports, none were made available for

6

review; and the mitigated negative declaration ignored the project's impacts on transportation and traffic, air quality, noise, hazardous materials and seismic and liquefaction potential.

Prior to the March 13, 2014 planning commission hearing, the city planning department prepared an appeal staff report. The appeal staff report responded to each of the points raised by Mr. Gryczman in both appeals. The appeal staff report recommended the planning commission: deny the appeals of Regent Properties, LLC; sustain the density bonus and vesting tentative tract approvals; adopt the revised findings for the density bonus; adopt the city planning department's findings for the vesting tentative tract; and adopt mitigated negative declaration, ENV-2012-1111-MND-REC1.

Concerning the density bonus, the appeal staff report states: "In order to disapprove the granting of Density Bonus Incentives, the Director of Planning has to determine that the incentives <u>are not necessary</u> to provide the financial means and construction scaling to set aside the required number of affordable units and to construct the density bonus units. . . . [T]he requested increase in the floor area and building height are necessary to expand the project's building envelope so that the 13 density bonus units being constructed are of equal size, have the same number of bedrooms, and the same amenities and quality incorporated into the four (4) set aside units."

In addition, the appeal staff report responded to the challenges to the mitigated negative declaration. Concerning traffic impacts, a transportation department report confirms no significant impacts will result because the number of new condominium units and peak hour trips are below the relevant threshold. The appeal staff report adds: "In response to environmental factors identified in the initial study[,] both Decision Letters incorporate into their conditions numerous traffic/transportation/parking mitigation measures: 1) Public Services- Construction Activities near Schools, 2) Public Services[-] Schools Affected by Haul Route, 3) Transportation- Haul Route, 4) Transportation Traffic[], and 5) Construction Staging and Parking Plan. [¶] These above mitigation measures will prevent traffic and parking problems during construction and after project implementation, including preventing access problems or blockage of the

7

alleys by construction equipment and materials." As for greenhouse gas emission impacts, the appeal staff report concludes compliance with the Los Angeles Building Code requires the project to reduce energy and water use, waste and carbon footprint. The appeal staff report notes, "The scope of the project, 17 new dwelling units (49 new condominium units) with 10.5 new peak hour trips, does not warrant any technical reports or special studies." Concerning earthquake and liquefaction impacts, the appeal staff report found the soils report considers these potential impacts: "[Mr. Gryczman] was informed with sufficient time (months in advance) of the existence of the soils report and its approval by the Department of Building & Safety. A staff report presented to the Advisory Agency on May 8, 2013, makes reference to a Soils Report and a Building & Safety Letter approving the Soils Report for the subject project. On Friday, November 8, 2013, via email [Mr. Gryczman] was also advised that the Soils Report and approval letter was in the administrative file, but [Mr. Gryczman] decided not to visit the Planning Department Offices to review the administrative file. . . . Furthermore, the project's soils report was reviewed by the geologist with the City's Department of Building and Safety, which includes conditions that have to be implemented during and after construction. The [mitigated negative declaration] also includes standard mitigation measures pertaining to earthquake and liquefaction potential impacts MND-VI-10 and MND-VI-70 respectively." On March 13, 2014, the planning commission held a public hearing on Regent Properties, LLC's appeals. The planning commission denied the appeals in a determination letter dated April 23, 2014.

G. The Appeal to the Council

On April 29, 2014, Regent Properties LLC appealed the planning commission's decision to the council. On June 17, 2014, the council's Planning and Land Use Management Committee held a public meeting to consider the appeal. Following public comment, the Planning and Land Use Management Committee recommended the council deny the appeal of Regent Properties LLC. On June 30, 2014, the city planning

8

department corrected the administrative record. The city planning department's correction reflected its November 26, 2013 approval of the final mitigated negative declaration, ENV-2012-1111-MND-REC1, filed on November 18, 2013. On July 1, 2014, the council acted on the recommendation of the Planning and Land Use Management Committee and denied the appeal. The council adopted: "the Mitigated Negative Declaration [ENV-2012-1111-MND-REC1] filed on April 12, 2013." In addition, the council adopted the planning commission findings, including the environmental findings, as its own. Defendant's notice of determination was filed on July 1, 2014.

## H. Trial Court Proceedings

### 1. Mandate petition

On July 7, 2014, plaintiffs filed a verified mandate petition challenging defendant's approval of the project. The mandate petition alleges defendant violated the California Environmental Quality Act by adopting a mitigated negative declaration instead of preparing an environmental impact report. In addition, the mandate petition challenges the defendant's density bonus approval as violations of the municipal code and Government Code section 65915.

The petition mandate alleges: there are a number of sensitive uses within 500 feet of the project site; the sensitive uses include the Brentwood Presbyterian Church's nursery school, an elementary school and a medical office center; the mitigated negative declaration fails to adequately quantify the ambient noise levels or the duration of the construction activities given the close proximity of the schools and medical office; the mitigated negative declaration does not consider the construction impacts relating to greenhouse gas emissions, dust and asbestos; the required liquefaction evaluation and fault zone investigation have not been performed for the project; the mitigated negative declaration ignores the use and safety of the alleys during and after construction of the

9

project; and defendant's technical studies concerning the project's environmental impacts are either non-existent or unavailable for public review. The mandate petition alleges: "These narrow alleys represent the only vehicular access points for several buildings facing San Vicente Boulevard. Since there are no other vehicular access points for these buildings, any construction activities that alter, limit or constrain access represents a significant impact. In addition, the alleys are regularly used by the neighboring nursery school to access the outdoor playground for drop off and pickup. Furthermore, medical office patients use this alley as the only egress from the parking lot of the medical office center fronting San Vicente Boulevard."

## 2. Opposition to the mandate petition

On December 19, 2014, defendant and the developer filed a joint opposition to the mandate petition. Defendant and the developer argued: plaintiffs wrongly rely on the initial and revised mitigated negative declarations; plaintiffs have ignored the final mitigated negative declaration; the project does not require defendant to prepare an environmental impact report; there is no substantial evidence to support a fair argument that the proposed project will entail substantial, unmitigated environmental impacts; and plaintiffs misread the density bonus laws and cannot show they were prejudiced by any irregularity in the density bonus approval procedure.

## 3. The trial court's ruling

On March 6, 2015, the trial court held a hearing on mandate petition. On March 13, 2015, the trial court entered an order and judgment denying the writ of mandate petition. The trial court found the council's letter, which adopted "the Mitigated Negative Declaration [ENV-2012-1111-MND-REC1], filed on April 12, 2013" was ambiguous. However, the trial court concluded defendant adopted the final mitigated negative declaration with the project title "ENV-2012-1111-MND-REC1." The trial court

10

explained the planning commission, the council's Planning and Land Use Management Committee and the council considered and referenced the final mitigated negative declaration. Furthermore, plaintiffs specifically referred to the final mitigated negative declaration in Mr. Gryczman's November 1, 2013 and April 28, 2014 letters. Moreover, plaintiff, Regent Properties, LLC's consultant, the Urban Crossroads Engineers, provided comments on the final mitigated negative declaration. The trial court reasoned it made no sense for defendant to revise and recirculate the final mitigated negative declaration only to adopt the original version.

Further, the trial court: found plaintiffs did not make a fair argument, based on substantial evidence in the administrative record, that the project's impacts required preparation of an environmental impact report; rejected plaintiffs' contentions that the mitigated negative declaration fails to analyze geotechnical impacts and mitigation measures VI-50 and VI-70 impermissibly defer mitigation; found the project would result in improvements to the alleys and would not entail significant traffic impacts; and found plaintiffs failed to offer evidence that the project, as mitigated, would entail significant noise impacts. The trial court also found, "Nowhere in the record does Petitioner provide any facts as to what can be expected in the way of greenhouse gas emissions, asbestos, or dust from this Project nor what effect any of these impacts are likely to have on the environment."

The trial court also rejected plaintiffs' density bonus arguments. The trial court found plaintiffs failed to provide evidence showing the density bonus was not required. In addition, the trial court found the planning director's approval of the density bonus did not violate Los Angeles Municipal Code section 12.22 A.25, subdivision (g).

## III.  DISCUSSION

### A.  Overview of California Environmental Quality Act

The California Environmental Quality Act's four purposes are to:  inform the government and public about a proposed activity's potential environmental impacts; identify ways to reduce or avoid environmental damage; prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and disclose to the public the rationale for governmental approval of a project that may significantly impact the environment.  (*California Building Industry Assn. v. Bay Area Air Quality Management District* (2015) 62 Cal.4th 369, 382 (*California Building Industry Assn.*); *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285-286 (*Tomlinson*); see Cal. Code Regs., tit. 14, § 15002.)  To achieve these goals, the California Environmental Quality Act and the regulations implementing it provide for a three-step process.  (Cal. Code Regs., tit. 14, § 15000 et seq., hereafter Guidelines.) (*California Building Industry Assn., supra,* 62 Cal.4th at p. 382; *Tomlinson, supra,* 54 Cal.4th at p. 286.)  Our Supreme Court has explained:  "First, the public agency must determine whether the activity is a 'project,' i.e., an activity that is undertaken, supported, or approved by a public agency and that 'may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' (§ 21065.)"  [¶]  Second, if the proposed activity is a project, the agency must next decide whether the project is exempt from the [California Environmental Quality Act] review process under either a statutory exemption (see § 21080) or a categorical exemption set forth in the [California Environmental Quality Act] Guidelines (see § 21084, subd. (a); Guidelines, § 15300 et seq.).  If the agency determines the project is not exempt, it must then decide whether the project may have a significant environmental effect.  And where the project will not have such an effect, the agency 'must "adopt a negative declaration to that effect."' (*Tomlinson, supra,* 54 Cal.4th at p. 286, quoting § 21080, subd. (c); see Guidelines, § 15070.)  [¶]  Third, if the agency finds the project 'may have a significant

12

effect on the environment,' it must prepare an [environmental impact report] before approving the project. (§§ 21100, subd. (a), 21151, subd. (a), 21080, subd. (d), 21082.2, subd. (d).)" (*California Building Industry Assn., supra,* 62 Cal.4th at p. 382; accord, *Tomlinson, supra,* 54 Cal.4th at p. 286.)

Here, defendant adopted a mitigated negative declaration. A mitigated negative declaration may be used if the following two factors are present. First, a mitigated negative declaration may be used if revisions in the project plans would avoid or mitigate potentially significant effects on the environment. And, second, a mitigated negative declaration may be used if there is no substantial evidence that the project, as revised, may have a significant environmental effect. (*W.M. Barr & Co., Inc. v. South Coast Air Quality Management Dist.* (2012) 207 Cal.App.4th 406, 434 (*W.M. Barr*); *Citizens for Responsible and Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1332; *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 390.) Section 21064.5 provides, "'Mitigation negative declaration' means a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (See also § 21080, subd. (c)(2).)

## B. Standard of Review

Under sections 21168 and 21168.5, we review a public agency's decisions for abuse of discretion. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135.) Section 21168.5 states, "Abuse of discretion is established

13

if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." In reviewing the mitigated negative declaration, we consider whether there is substantial evidence in the record to support a fair argument of the project's significant environmental effects. (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1612; *Architectural Heritage Assn v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1109 (*Architectural Heritage Assn.*).)

The fair argument standard has been synthesized as follows: "The fair argument standard of review is not the typical substantial evidence standard, i.e., whether there is substantial evidence to support the decision not to prepare an [environmental impact report]. Rather, the fair argument standard of review is whether, after examining the entire record, there is substantial evidence to support a fair argument that a project may have a significant effect on the environment. This is a low threshold for the preparation of an [environmental impact report], reflecting a preference to resolve doubts in favor of full-blown environmental review. [Citations.]" (*Sierra Club v. California Dept. of Forestry & Fire Protection* (2007) 150 Cal.App.4th 370, 381; accord *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1580.) Guidelines, section 15064, subdivision (f)(1) states: "If the lead agency determines there is substantial evidence in the record that the project may have a significant impact on the environment, the lead agency shall prepare an [environmental impact report]. (*Friends of B Street v. City of Hayward* (1980) 106 Cal.App.3d 988). Said another way, if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an [environmental impact report] even though it may also be presented with other substantial evidence that the project will not have a significant effect (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68)."

Where the public agency issues a mitigated negative declaration, the project opponent must show two factors by substantial evidence in the administrative record. First, the project opponent must show the mitigation measures are inadequate. Second, the opponent must show the project as revised or mitigated may have a significant

environmental effect. (*W.M. Barr, supra,* 207 Cal.App.4th at p. 434; *Architectural Heritage Assn., supra,* 122 Cal.App.4th at pp. 1095, 1112.) Substantial evidence is defined in Guidelines, section 15384 which section provides: "(a) 'Substantial evidence' as used in these guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence. [¶] (b) Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." Whether the administrative record contains sufficient evidence to support a fair argument is a question of law. (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1036; *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 508.) Accordingly, we review de novo the trial court's findings and conclusions. (*Mejia v. City of Los Angeles* (2005) 130 Cal.App.4th 322, 332; *Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333, 1346.)

## C. Defendant Adopted the Final Mitigated Negative Declaration

Plaintiffs argue the mitigation measures in the mitigated negative declaration are inadequate. In support of their argument, plaintiffs rely on the initial mitigated negative declaration filed on April 12, 2013, and the revised mitigated negative declaration filed on July 26, 2013. Plaintiffs ignore the final mitigated negative declaration, contending defendant adopted the initial mitigated negative declaration filed on April 12, 2013.

On July 1, 2014, the council adopted "the Mitigated Negative Declaration [ENV-2012-1111-MND-REC1] filed on April 12, 2013." Plaintiffs argue the only mitigated

15

negative declaration filed on April 12, 2013 is the initial declaration. Further, plaintiffs contend defendant's July 1, 2014 notice of determination shows the council approved the initial mitigated negative declaration because the project title on the notice is "ENV-2012-1111-MND."

There is some ambiguity as to whether the council adopted the initial or final mitigated negative declaration. However, our review of the administrative record persuades us the council adopted the final mitigated negative declaration. The city planning department's November 26, 2013 determination letter approves the mitigated negative declaration, ENV-2012-1111-MND, and tentative tract map subject to various conditions. Although the determination letter does not use the project title "ENV-2012-1111-MND-REC1," approval is for the final mitigated negative declaration. The city planning department's June 30, 2014 correction letter clarifies approval is for the final mitigated negative declaration, "On November 26, 2013 . . . , the Advisory Agency approved Mitigated Negative Declaration ENV-2012-1111-MND-REC1 as the environmental clearance and approved Vesting Tentative Tract No. 71898. . . ."

Moreover, the conditions of approval in the determination letter are identical to the mitigation measures in the final mitigated negative declaration. For example, MM-7 (geotechnical report) and MM-8 (liquefaction area) require a geotechnical report and compliance with the conditions contained in the building and safety department's soils report approval letter. These conditions are the same as mitigation measures VI-50 (geotechnical report) and VI-70 (liquefaction area) in the final mitigated negative declaration. By contrast, the initial mitigation declaration, filed on April 12, 2013, does not include any mitigation measures concerning potential geotechnical impacts.

Further, MM-9 (greenhouse gas emissions) requires compliance with the most recent version of title 24 of the California Building Standards Code (title 24) to meet mandated greenhouse gas reduction goals. This is identical to mitigation measure VII-10 (greenhouse gas emissions) in the final mitigated negative declaration. By comparison, mitigation measure VII-10 (greenhouse gas emissions) in both the initial and revised

16

mitigated negative declarations do not require compliance with the most recent version of title 24.

In addition, MM-14, MM-15 and MM-16 impose conditions to reduce noise generated by the project. They are identical to mitigation measures XII-20, XII-70 and XII-230 in the final mitigated negative declaration. By contrast, the initial mitigated negative declaration does not contain mitigation measures XII-70 and XII-230. Finally, MM-24 is the same as mitigation measure XVI-80 in the final mitigated negative declaration. Both MM-24 and mitigation measure XVI-80 state, "The applicant shall provide a tentative schedule for delivery materials and haul materials to the Department of Transportation and follow directions on various traffic mitigation measures including but not limited to direction signs, flag men, and all deliveries shall take place during off-pick hours." By contrast, neither the initial nor revised mitigated negative declaration contains a traffic mitigation measure XVI-80. Comparing the conditions in the determination letter to the mitigation measures in the initial, revised and final mitigated negative declarations, we conclude the council approved the final declaration.

Also, defendant considered and adopted the final mitigated negative declaration throughout the administrative process. The appeal staff report, which was prepared for the March 13, 2014 planning commission hearing, responds to Mr. Gryczman's objections to the final mitigated negative declaration. As noted, Mr. Gryczman is executive vice president of Region Properties LLC. The appeal staff report recommends denial of plaintiff's appeals and adoption of the mitigated negative declaration, ENV-2012-1111-MND-REC1. Further, the appeal staff report recommends approval of the revised findings including reference to mitigated negative declaration, "ENV-2012-1111-MND-REC1." In addition, the final mitigated declaration is attached as an exhibit to the appeal staff report. Moreover, the planning commission's March 13, 2014 meeting agenda indicates it considered the appeal of the final mitigated declaration, "ENV-2012-1111-MND-REC1." And the planning commission's March 13, 2014 meeting minutes reflect adoption of the final mitigated negative declaration. Likewise, the planning

17

commission's revised findings show consideration of the final mitigated negative declaration.

The final mitigated negative declaration also was considered by the council's Planning and Land Use Management Committee at its June 17, 2014 meeting. The Planning and Land Use Management Committee recommended the council adopt "the Mitigated Negative Declaration [ENV-2012-1111-MND-REC1] filed on April 12, 2013." On July 1, 2014, the council acted on the Planning and Land Use Management Committee's recommendation and adopted the April 12, 2013 "Mitigated Negative Declaration [ENV-2012-1111-MND-REC1]." Prior to the council's July 1, 2014 hearing, the city planning department issued a June 30, 2014 letter to correct the approval date of the mitigated negative declaration, ENV-2012-1111-MND-REC1. The June 30, 2014 letter states in part: "A typographical error was discovered in the [California Environmental Quality Act] Findings Section in relation to the date the Environmental Staff Advisory Committee approved this Mitigated Negative Declaration. The correct date of the approval shown in the Published [Mitigated Negative Declaration] was **November 18, 2013**, which also marks the end of the comment period."

Plaintiffs argue by referring to the initial mitigated negative declaration's filing date of April 12, 2013, defendant created public confusion as to whether the project's environmental impacts will be mitigated. We disagree. The final mitigated negative declaration was recirculated and notice was provided to the public before its adoption by defendant. The final mitigated negative declaration was published in the *Los Angeles Times* on October 17, 2013. Copies of the final mitigated negative declaration were mailed to individuals who gave testimony at the public hearing, including Mr. Glyczman. In addition, Mr. Glyczman commented on the recirculated final mitigated negative declaration in a November 1, 2013 letter to the city. Also, the engineers affiliated with plaintiff, Regent Properties, LLC's consultant, Urban Crossroads, Inc., provided comments on the final mitigated negative declaration, ENV-2012-1111-MND-REC1, dated November 18, 2013. As the trial court observed, it makes no sense for defendant to revise and recirculate the final mitigated negative declaration but then adopt the initial

18

version. Based on our review of the administrative record, we conclude defendant adopted the final mitigated negative declaration.

### D. The Final Mitigated Negative Declaration Provides Adequate Mitigation Measures

#### 1. Plaintiffs' arguments

Plaintiffs contend defendant was required to prepare an environmental impact report because the project's potential geotechnical, traffic, noise and other impacts are unmitigated. We discuss each of these potential environmental impacts below. The administrative record contains no substantial evidence to support a fair argument that the mitigation measures are inadequate and the project, as mitigated, may have a significant environmental effect. (*W.M. Barr, supra,* 207 Cal.App.4th at p. 434; *Architectural Heritage Assn., supra,* 122 Cal.App.4th at p. 1112.)

#### 2. Geotechnical impacts

Plaintiffs contend defendant was required to prepare an environmental impact report because substantial evidence supports a fair argument that the project's potential geotechnical impacts are unmitigated. Plaintiffs argue the mitigated negative declaration fails to analyze potential geology and seismology impacts. According to plaintiffs, these impacts are detailed in a June 3, 2014 letter by their engineering geologist, Feffer Geological Consulting. Plaintiffs' geological consultant, Joshua Feffer, states in the letter, "In my opinion and my experience the liquefaction evaluation and fault investigation should be completed and properly reviewed and approved by the City of Los Angeles Department of Building and Safety before the City grants any approval for the project." Plaintiffs admit the revised negative declaration requires submission of a geotechnical report in mitigation measures VI-50 and VI-70. However, they contend deferring the geotechnical study to a future date is improper.

19

The final mitigated negative declaration requires submission of a geotechnical report and compliance with the Department of Building and Safety's soils report approval letter. Mitigation measure VI-50 (geotechnical report) provides: "Prior to the issuance of grading or building permits, the applicant shall submit a geotechnical report, prepared by a registered civil engineer or certified engineering geologist, to the Department of Building and Safety, for review and approval. The geotechnical report shall assess potential consequences of any soil strength loss, estimation of settlement, lateral movement or reduction in foundation soil-bearing capacity, and discuss mitigation measures that may include building design consideration. Building design considerations shall include, but are not limited to: ground stabilization, selection of appropriate foundation type and depths, selection of appropriate structural systems to accommodate anticipated displacements or any combination of these measures. [¶] The project shall comply with the conditions contained within the Department of Building and Safety's Geology and Soils Report Approval Letter for the proposed project, and as it may be subsequently amended or modified."

Mitigation measure VI-70 (liquefaction area) states: "Environmental impacts may result due to the proposed project's location in an area with liquefaction potential. However, these potential impacts will be mitigated to less than significant level by the following measures: [¶] Prior to the issuance of grading or building permits, the applicant shall submit a geotechnical report, prepared by a registered civil engineer or certified engineering geologist, to the Department of Building and Safety, for review and approval. The project shall comply with the Uniform Building Code Chapter 18. Division 1 Section 1804.5 Liquefaction Potential and Soil Strength Loss. The geotechnical report shall assess potential consequences of any liquefaction and soil strength loss, estimation of settlement, lateral movement or reduction in foundation soil-bearing capacity, and discuss mitigation measures that may include building design consideration. Building design considerations shall include, but are not limited to: ground stabilization, selection of appropriate foundation type and depths, selection of appropriate structural systems to accommodate anticipated displacements or any

20

combination of these measures. [¶] The project shall comply with the conditions contained within the Department of Building and Safety's Geology and Soils Report Approval Letter for the proposed project, and as it may be subsequently amended or modified."

Contrary to plaintiffs' contention, mitigation measures VI-50 and VI-70 do not constitute deferred mitigation. The geotechnical report referenced in mitigation measures VI-50 and VI-70 were submitted by the developer as part of its project application. The developer provided defendant with two geotechnical reports prepared by Geotechnologies, Inc. dated October 15, 2007 and March 15, 2012. The two geotechnical reports were reviewed by the building and safety department. And the reports' recommendations were incorporated as conditions in the June 28, 2012 soils report approval letter. The soils report approval letter also imposes 32 additional conditions as part of the approval. Mitigation measures VI-50 and VI-70 incorporate these 33 conditions by requiring the project to comply with the conditions contained in the soils report approval letter.

Plaintiffs concede the geotechnical reports and soils report approval letter are in the administrative record. But they assert these reports and approval letter were not available to the public during the comment period. Plaintiffs argued defendants never made any of the reports available to the public prior to the project's approval and adoption of the mitigated negative declaration. To support their argument, plaintiffs cite to the June 3, 2014 letter from Mr. Feffer of Feffer Geological Consulting. Plaintiffs also rely upon a letter from their attorney, Fred Gaines. Both letters state that no geotechnical study has been performed for the project site. Plaintiffs assert the letters' authors would not have made these statements if the geotechnical reports had been readily available for public review.

But the evidence in the administrative record shows staff made the geotechnical reports and soils report approval letter available for public review. The appeal staff report, prepared for the planning commission hearing, states: "[Mr. Gryczman] was informed with sufficient time (months in advance) of the existence of the soils report and

21

its approval by the Department of Building & Safety. A staff report presented to the Advisory Agency on May 8, 2013, makes reference to a Soils Report and a Building & Safety Letter approving the Soils Report for the subject project. On Friday, November 8, 2013, via email Mr. Gryczman was also advised that the Soils Report and approval letter was in the administrative file, but Mr. Gryczman decided not to visit the Planning Department Offices to review the administrative file. [The California Environmental Quality Act] requires the Lead Agency to make the administrative record available for review and not to email, hand deliver, or deliver portions of the administrative record. Furthermore, the project's soils report was reviewed by the geologist with the City's Department of Building and Safety, which includes conditions that have to be implemented during and after construction." Furthermore, at the Planning and Land Use Management Committee's June 17, 2014 hearing, city planning staff, Jose Carlos Romero-Navarro, testified the record was made available to the public for review. Mr. Romero-Navarro stated: "[Mr. Gryczman] indicates . . . the record was not available to -- to the public and that's totally wrong. Actually I have in my cubicle on my desk the administrative record. And whenever anybody came to see the file -- to review the file that was available for review. There was only one person who came and -- and that's it. No one else came. [¶] [Mr. Gryczman . . .] asked me to send him the -- the reports used to prepare the [mitigated negative declaration]. The [California Environmental Quality Act] requires the City only to make the reports available -- to have the administrative record available. So I invited him to come to the office, but he was on a trip and he didn't come to the office at all. He hasn't actually -- hasn't reviewed the file to my knowledge."

Also, plaintiffs and their engineering geologist contend a liquefaction analysis should have been performed. They reason the project site is located in an area subject to potential earthquake-induced liquefaction. But the developer and defendant did evaluate the potential liquefaction impact. A liquefaction study was conducted by the developer's geotechnical engineer and discussed in the October 15, 2007 geotechnical report. In addition, the June 28, 2012 soils report approval letter found no liquefaction issue. The

soils report approval letter states: "The site is located in a designated liquefaction hazard zone as shown on the 'Seismic Hazard Zones' map issued by the State of California. The Liquefaction study included as a part of the previous report demonstrates that the site does not possess a liquefaction potential. This satisfies the requirement of the 2011 Los Angeles City Building Code Section 1802.2.7." Plaintiffs identify no substantial evidence that supports a fair argument the geotechnical impacts mitigation measures are inadequate and the project as mitigated may have a significant environmental effect. (*W.M. Barr, supra,* 207 Cal.App.4th at p. 434; *Architectural Heritage Assn., supra,* 122 Cal.App.4th at p. 1112.)

### 3. Traffic impacts

Plaintiffs contend the mitigated negative declaration's study of traffic impacts is deficient. We disagree. Defendant was not required to study the project's operational traffic impacts because it falls under its threshold guidelines. The final mitigated negative declaration states, "Per [Los Angeles California Environmental Quality Act] Guidelines vehicular trips generated by the project will be less than significant." The November 26, 2013 determination letter explains: "The Deputy Advisory Agency also found that no traffic/transportation study is required because the project as proposed does not exceed the number of dwelling units (48 condominium units) and trip generation thresholds (25 peak hour trips). The subject project includes the demolition of 32 exi[s]ting apartment units and the construction of 49 condominium units. The net increase[] in the number of dwelling units is 17, which is below the 48-unit threshold. The net increase in the number of peak hour trips for the subject project is 8.84 peak hour trips (based on [Department of Transportation] factor of 0.52/unit) which is below the 25 peak hour trip threshold." The appeal staff report states: "Based on the City's [California Environmental Quality Act] Threshold Guidelines for Projects Exempt from Traffic Study Requirements the number of new peak hour trips for a multiple family project is .52 trips per dwelling unit. The 17 net new dwelling units will only generate

23

8.84 new evening peak hour trips. To verify whether Planning Staff had correctly calculated the trips, a report from the Department of Transportation [] was requested after the Advisory Agency hearing on the Tract Map. The [Department of Transportation] report concluded that there would be no significant impacts because the number of new condominium units and the number of new peak hour trips are below the threshold."

During the initial study, defendant's planning staff found the greatest potential for traffic impacts to the area would be during the project's construction phase. To reduce construction-related traffic impacts, the final mitigated negative declaration contains a number of mitigation measures. Mitigation measures XIV-40 and XIV-50 impose conditions to lessen construction-related traffic impacts on the nearby schools. Mitigation measure XIV-40 (construction activity near schools) provides: "The developer and contractors shall maintain ongoing contact with administrator of Brentwood Science school and church preschool. The administrative offices shall be contacted when demolition, grading and construction activity begin on the project site so that students and their parents will know when such activities are to occur. The developer shall obtain school walk and bus routes to the schools from either the administrators or from the [Los Angeles Unified School District]'s Transportation Branch . . . and guarantee that safe and convenient pedestrian and bus routes to the school[s] be maintained. [¶] The developer shall install appropriate traffic signs around the site to ensure pedestrian and vehicle safety. [¶] There shall be no staging or parking of construction vehicles, including vehicles to transport workers on any of the streets adjacent to the school. [¶] Due to noise impacts on the schools, no construction vehicles or haul trucks shall be staged or idled on these streets during school hours." Mitigation measure XIV-50 states: "[Los Angeles Department of Building and Safety] shall assign specific haul route hours of operation based upon Brentwood Science School[] and church preschool hours of operation. [¶] Haul route scheduling shall be sequenced to minimize conflicts with pedestrians, school buses and cars at the arrival and dismissal times of the school day. Haul route trucks shall not be routed past the school during

24

periods when school is in session especially when students are arriving or departing from campus."

In addition, the final mitigated negative declaration requires the developer to obtain haul route approval and to comply with other traffic mitigation measures. Mitigation measure XVI-30 (transportation/haul route) provides: "The developer shall install appropriate traffic signs around the site to ensure pedestrian and vehicle safety. [¶] (Non-Hillside): Projects involving the import/export of 20,000 cubic yards or more of dirt shall obtain haul route approval by the Department of Building and Safety. [¶] (Hillside and Subdivisions): Projects involving the import/export of 1,000 cubic yards or more of dirt shall obtain haul route approval by the Department of Building and Safety. [¶] (Hillside Projects): [¶] All haul route hours shall be limited to off-peak hours as determined by Board of Building and Safety Commissioners. [¶] The Department of Transportation shall recommend to the Building and Safety Commission Office the appropriate size of trucks allowed for hauling, best route of travel, the appropriate number of flag people. [¶] The Department of Building and Safety shall stagger haul trucks based upon a specific area's capacity, as determined by the Department of Transportation, and the amount of soil proposed to be hauled to minimize cumulative traffic and congestion impacts. [¶] The applicant shall be limited to no more than two trucks at any given time within the site's staging area." (Emphasis omitted.) Further, mitigation measure XVI-80 (transportation/traffic) states: "The applicant shall provide a tentative schedule for delivery materials and haul materials to the Department of Transportation and follow directions on various traffic mitigation measures including but not limited to direction signs, flag men, and all deliveries shall take place during off-pick hours."

Notwithstanding these construction-related traffic mitigation measures, plaintiffs argue the measures are inadequate. Plaintiffs rely on a June 11, 2014 letter by their traffic and acoustical engineer, Urban Crossroads, Inc., concerning the project's construction-related impacts. The Urban Crossroads, Inc. letter states: "No adequate response was provided to remedy the existing alleyway and access circulation problems

25

that will be exacerbated with the Project construction. In addition, the [mitigated negative declaration] ignores the potential impacts to the serious congestion, access and queuing issues associated with the two substandard narrow alleys on two sides of the Project site. These alleys represent the only vehicular access to several buildings facing San Vicente Boulevard. Since there are no alternative vehicular access points for these buildings, any construction activities that remotely alters, limits, constrains, or inhibits access represents a significant impact. New development today typically requires multiple access points to address the fire safety issues associated with a single point of ingress and egress. In addition, the narrow alleys are regularly used by the neighboring nursery school to access the outdoor playground and for drop off and pickup."

Plaintiffs also rely on photographs of the alleys, which Mr. Gaines, on behalf of Regent Properties, LLC, presented as part of the Planning and Land Use Management Committee appeal. According to plaintiffs, the photographs show the alleys are so narrow that it is difficult to pass with another car coming from the opposite direction. Further, refuse or other large trucks sometimes block the narrow alleys. Given the access and circulation issues, plaintiffs argue the mitigated negative declaration should have analyzed the continued usability and safety of the alleys during and after construction.

Contrary to plaintiffs' contentions, the project will improve access and relieve congestion in the adjoining alleys. The November 26, 2013 determination letter imposes conditions that widen and improve the alleys. The conditions of approval require the developer to dedicate 2.5 foot wide strips of land along both alleys including a 10-foot by 10-foot alley cut corner at the intersection of both alleys. In addition, the developer must make improvements to the alleys along the project site. The determination letter concludes, "The potential access impact to the proposed project and adjoining existing facilities has been reduced to a level of insignificant by dedication and improvement requirements along existing alleys adjoining the subject site as required by the Bureau of Engineering, and also as conditioned by the Deputy Advisory Agency."

Also, the project eliminates some existing parking spaces that require access from the alleys. At the May 8, 2013 public hearing held by the city planning department, the

26

developer's representative testified: "[P]resently, some of the exi[s]ting parking for these -- these existing 32 units park off that alley. . . . So this project will remove that -- not only widen those alleys, it will remove the parking . . . from the alley itself, and all the access to the parking for this building will be on Montana Avenue on the east side of the property, which is far away as possible from the alley that runs to the west of this site."

In addition, the appeal staff report discusses the mitigation measures taken to prevent traffic problems. The appeal staff report states: "In response to the environmental factors identified in the initial study[,] both Decision Letters incorporate into their conditions numerous traffic/transportation/parking mitigation measures: 1) Public Services- Construction Activities near Schools, 2) Public Services[-] Schools Affected by Haul Route, 3) Transportation- Haul Route, 4) Transportation Traffic[], and 5) Construction Staging and Parking Plan. [¶] These above mitigation measures will prevent traffic and parking problems during construction and after project implementation, including preventing access problems or blockage of the alleys by construction equipment and materials."

Plaintiffs argue defendant failed to include the conditions in the vesting tract map and density bonus approvals in the mitigated negative declaration. They assert there can be no meaningful scrutiny of the mitigated negative declaration where mitigation measures are not included in the document. Plaintiffs rely on *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 884 (*Oro Fino*), a case involving deferred mitigation. In *Oro Fino*, the Third Appellate District held mitigation measures, which called for plans to be formulated after project approval, were deficient because there was no public scrutiny of them. (*Id*. at pp. 884-885.) Unlike the situation in *Oro Fino*, there has been public scrutiny of the conditions set forth in the determination letters. The conditions addressing the project's access and congestion impacts were discussed at the May 8, 2013 public hearing prior to project approval. After the hearing, planning department staff responded to Mr. Gryczman's May 8, 2013 letter concerning traffic impacts. In his letter, Mr. Gryczman argued construction would result in access and circulation problems and create traffic congestion in the narrow

27

alleys. In response, the staff report states: "The project will improve the alley condition. By complying with the Bureau of Engineering conditions, that the applicant dedicate 2 1/2 feet on each side of the two alley[s]. The alleys will be widened the same distance, which will increase the width of the alleys. Some of the existing parking of the 32 units park in the alley, which compounds the problem of access/congestion. . . . The applicant will widen and remove parking from the alley. All the access for the building will be on Montana Avenue, on the eastside of the property away from the alley, which will improve conditions and serve to relieve congestion." Besides the May 8, 2013 public hearing, the conditions of approval in the determination letters were discussed during the administrative appeal. Furthermore, there was no need for the final mitigated negative declaration to include these conditions. The initial study found vehicular trips generated by the project would be less than significant.

Plaintiffs contend even if defendant and the developer can rely on condition MM-11 in the November 26, 2013 determination letter, this is an improper deferral of a traffic mitigation measure. But condition MM-11 imposes specific requirements for the construction staging and parking plan. Condition MM-11 provides: "The plan shall identify where all the construction materials, equipment, and vehicles will be stored through the construction phase of the project, as well as where contractor, subcontractor, and laborers will park their vehicles so as to prevent blockage along Montana Avenue, Bundy Drive, or any alley or streets in the vicinity of the construction site." MM-11 also imposes the following additional conditions: no construction equipment or materials may be stored within the public right of way; during excavation and grading, only a single truck hauler is allowed on site at any one time; truck drivers must follow the travel plan or approved haul route; trucks delivering materials and construction machinery or removing graded soil are limited to off-peak traffic hours; construction vehicle parking and queuing must be in substantial compliance with the construction staging and parking plan; delivery vehicles must not obstruct access to the adjoining alleys, Montana Avenue, Bundy Drive, or any alley or streets in the vicinity of the construction site; a radio operator shall be on-site to coordinate the movement of materials and personnel; and the

28

radio operator is to keep Montana Avenue and alleys adjoining the project site open for access to neighboring residences and businesses. Condition MM-11 also requires the plan be approved by the building and safety and traffic departments. Condition MM-11 is not an improper deferral because it sets out specific standards for the construction staging and parking plan to follow. Mitigation measures that require compliance with other regulations or establish specific performance criteria are adequate. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 241; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 647-648; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794 ["If mitigation is feasible but impractical at the time of a general plan or zoning amendment, it is sufficient to articulate specific performance criteria and make further approvals contingent on finding a way to meet them."].)

The traffic measures in the final mitigated negative declaration are adequate and do not impermissibly defer mitigation. During the initial study, the city planning department analyzed traffic impacts using the defendant's threshold guidelines. The planning staff determined a traffic study was unnecessary because the project's vehicular trips would be less than significant. The initial study found the greatest potential for traffic impacts would be during the project's construction phase. These construction-related traffic impacts are alleviated by mitigation measures XIV-40, XIV-50, XVI-30 and XVI-80 in the final mitigated negative declaration. Plaintiffs challenge mitigation measure XVI-80 as an improper deferral because it requires the developer to: provide a tentative haul and delivery schedule to the traffic department; follow directions in various traffic mitigation measures including but not limited to direction signs and flag personnel; and ensure all deliveries must take place during off-peak hours. Mitigation measure XVI-80 does not constitute deferred mitigation. Mitigation measure XVI-80 is permissible and adequate under the California Environmental Quality Act because it establishes specific performance criteria for the future haul and delivery plan. (*Center for Biological Diversity v. Department of Fish & Wildlife, supra,* 234 Cal.App.4th at p. 241; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors, supra,* 216

29

Cal.App.4th at pp. 647-648; *Endangered Habitats League, Inc. v. County of Orange, supra,* 131 Cal.App.4th at p. 794.)  Plaintiffs have not cited substantial evidence that supports a fair argument the traffic mitigation measures are inadequate and the project, as mitigated, may have a significant environmental impact.  (*W.M. Barr, supra,* 207 Cal.App.4th at p. 434; *Architectural Heritage Assn., supra,* 122 Cal.App.4th at p. 1112.)

### 4.  Noise impacts

Plaintiffs contend the project's potential noise impacts are unmitigated.  Plaintiffs rely on two letters dated May 7, 2013 and June 11, 2014 from the Urban Crossroads engineering staff and their traffic and acoustical engineer, Bill Lawson.  In the May 7, 2013 letter, the Urban Crossroads engineering staff challenges the mitigated negative declaration's failure to provide a detailed noise analysis.  In his June 11, 2014 letter, Mr. Lawson contends the mitigated negative declaration should have identified the noise sensitive uses within 500 feet of the project site.  The noise sensitive uses include the nearby church and preschool and the medical office center.  In addition, Mr. Lawson's report states:  "With Presumed Ambient Noise Levels (Exhibit I.1-3) of 50 dBA for noise sensitive land use and construction noise levels from 77 to 86 dBA, the project construction impacts will approach 36 dBA.  [The] project construction noise impacts far exceed the existing ambient exterior noise level significance threshold of 10 dBA."  Mr. Lawson's analysis concludes, "The [mitigated negative declaration] fails to adequately quantify the ambient noise levels, the duration of construction activities, identify the type, amount, and scheduling of construction equipment to be used during each construction phase, or measure the distance from construction activities to noise sensitive uses."

As noted, plaintiffs and their engineering consultant challenge the mitigated negative declaration's failure to provide a detailed noise analysis including ambient noise levels.  But they do not cite to any regulation, standard or guideline that requires ambient noise testing.  An opinion suggesting that a study be performed is insufficient evidence to support a fair argument of the project's potential significant impact on the environment.

30

(*Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768, 786; *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1382 ["[L]ack of study, standing alone, does not give rise to a fair argument that the Project will in fact have significant cumulative effects."]; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1358. )

Under defendant's threshold guidelines, a project does not have a significant noise impact if it involves less than 75 residential units and generates less than 1,000 average daily vehicle trips. Here, the project's noise impact is below the defendant's California Environment Quality Act threshold guidelines. The staff report explains, "The project will involve the construction of 49-units and will generate 289.1 daily trips, which is less than the threshold of significance." Further, the project's operational noise will not have a significant impact on the surrounding properties. The initial study finds: "It is estimated that operational noise will center around 50 dBAs. A level that will be considered insignificant relative to neighboring noise levels." Moreover, the final mitigated negative declaration includes a measure that alleviates operational noise impacts to adjacent properties. To diminish operational noise from the installation and testing of mechanical equipment, mitigation measure XII-70 provides, "The proposed facility shall be designed with noise-attenuating features (physical as well as operational) by a licensed acoustical sound engineer to assure that operational sounds shall be inaudible beyond the property line."

In addition, the final mitigated negative declaration reduces the construction noise impacts on adjacent sensitive noise uses including the church and preschool. Mitigation measure XII-20 provides: "The project shall comply with the City of Los Angeles Noise Ordinance No. 144,331 and 161,574, and any subsequent ordinances, which prohibit the emission or creation of noise beyond certain levels at adjacent uses unless technically infeasible. [¶] Construction and demolition shall be restricted to the hours of 7:00 am to 6:00 pm Monday through Friday, and 8:00 am to 6:00 pm on Saturday. [¶] Demolition and construction activities shall be scheduled so as to avoid operating several pieces of equipment simultaneously, which causes high noise levels. [¶] The project contractor

31

shall use power construction equipment with state-of-the-art noise shielding and muffling devices. [¶] To mitigat[e] potential impacts on adjoining sensitive uses, the applicant will add a noise curtain/wall buffer between the project site and the neighboring school and church." In addition, mitigation measure XII-230 states, "The use of absorptive noise reduction barriers will result in the reduction of noise by 15 dba's."

Plaintiffs' engineering consultant, the Urban Crossroads staff, did not provide any study or analysis showing noise impacts would remain significant after imposition of the mitigation measures. And contrary to Urban Crossroads staff's contention, the final mitigated negative declaration identifies the nearby sensitive noise uses such as the neighboring school and church. Mitigation measure XII-20 reduces the project's anticipated construction noise impacts on the school and church by requiring among other things: compliance with city noise ordinances to the extent technically feasible; use of noise controls on construction equipment; and installation of a noise buffer wall. Further, no demolition or construction is permitted on Sunday and after 6:00 p.m. on the other days. Plaintiffs and their acoustical engineer do not provide evidence showing how mitigation measures XII-20, XII-70 and XII-230 fail to offset the project's potential noise effects. Plaintiffs have not identified substantial evidence creating a fair argument that the noise mitigation measures are inadequate and the project, as mitigated, may have a significant environmental effect. (*W.M. Barr, supra,* 207 Cal.App.4th at p. 434; *Architectural Heritage Assn., supra,* 122 Cal.App.4th at pp. 1095, 1112.)

5. Greenhouse gas impacts

Plaintiffs acknowledge the developer commissioned a June 6, 2014 greenhouse gas study before the council acted on their appeal. But plaintiffs argue the study is inadequate because it does not analyze construction and mobile greenhouse gas emissions. Plaintiffs also contend the mitigated negative declaration fails to analyze greenhouse gas emission impacts. We disagree.

Contrary to plaintiffs' contention, the June 6, 2014 study analyzes greenhouse gas emissions generated by both stationary and mobile sources. Assuming the project's compliance with the Los Angeles Green Building Code, the study finds the project's total emissions are 675 metric tons of carbon dioxide equivalent emissions per year. The project would generate a net increase of 250 metric tons of carbon dioxide equivalent emissions per year over the existing greenhouse gas emissions. The study indicates the project's greenhouse gas emissions are below the significance thresholds proposed by staff from the South Coast Air Quality Management District. The study concludes, "While [the] screening threshold was never adopted by the [South Coast Air Quality Management District] Board, it is worth noting that the Project's total [greenhouse gas] emissions would be far less than the 3,000 metric tons of [carbon dioxide equivalent] per year screening threshold proposed by the [South Coast Air Quality Management District ] staff in 2008."

Furthermore, plaintiffs provide no evidence showing the greenhouse gas emissions mitigation measures are inadequate. The final mitigated negative declaration contains two mitigation measures to reduce the project's greenhouse gas emissions. Mitigation measure III-10 (air pollution) provides in part: "General contractors shall maintain and operate construction equipment so as to minimize exhaust emissions. [¶] Trucks having no current hauling activity shall not be idle but be turned off." Mitigation measure VII-10 (greenhouse gas emissions) states: "Compliance with the most recent version of Title 24 will reduce future generation of greenhouse gases by at least 18%, which meets the State['s] greenhouse gas reduction goals. Compliance with Title 24 is mandatory[.]" The appeal staff report explains: "[T]he Los Angeles Building Code and its CalGreen components are based on Title 24 and it is amended and updated as new regulations are added to the State of California Building Standards Code. This is a mandate for the City of Los Angeles. Moreover, the scope of the project, 17 new dwelling units (49 new condominium units) and 8.84 new peak hour trips, does not warrant technical reports or special studies. The Los Angeles Building Code already addresses [greenhouse gas] reduction in its various provisions." Plaintiffs have not cited substantial evidence to

33

support a fair argument that the greenhouse gas mitigation measures are inadequate and the project, as mitigated, may have a significant environmental impact. (*W.M. Barr, supra,* 207 Cal.App.4th at p. 434; *Architectural Heritage Assn., supra,* 122 Cal.App.4th at p. 1112.)

### 6. Dust and asbestos impacts

Plaintiffs argue the mitigated negative declaration fails to analyze the dust and asbestos impacts. Plaintiffs rely on letters they submitted to defendant as evidence of the need for further dust and asbestos study. These letters contend the mitigated negative declaration should review the potential for air pollution, dust and asbestos impacts. The letter cites to the project's close proximity to the church, preschool and elementary school. But plaintiffs' letters suggesting dust and asbestos studies are insufficient evidence to support a fair argument of the project's potential significant impacts on the environment. (*Parker Shattuck Neighbors v. Berkeley City Council, supra,* 222 Cal.App.4th at p. 786; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1382; *Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1358. )

In addition, plaintiffs provide no evidence showing the dust and asbestos mitigation measures are inadequate. Mitigation measure III-10 (air pollution) imposes five requirements to control dust from demolition, grading and construction activities. Mitigation measures VIII-10 (existing toxic/hazardous construction materials) requires asbestos abatement prior to the issuance of a demolition permit. Mitigation measure VIII-60 (creation of a health hazard) requires fire department and public works department approvals of plans relating to the transport, containment, treatment and disposal of hazardous materials. Plaintiffs have failed to adduce substantial evidence creating a fair argument that the aforementioned mitigation measures are inadequate and the project, as mitigated, may have a significant environmental effect. (*W.M. Barr, supra,* 207 Cal.App.4th at p. 434; *Architectural Heritage Assn., supra,* 122 Cal.App.4th at p. 1112.)

E.  Density Bonus Ordinances

### 1. Plaintiffs' arguments and standard of review

Plaintiffs challenge defendant's approval of the density bonus and other incentives for the project.  Plaintiffs must show a prejudicial abuse of discretion to prevail on their administrative mandamus action.  (*Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212; *Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 141-142.)  Code of Civil Procedure section 1094.5, subdivision (b) states:  "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or findings are not supported by the evidence."  We are not bound by the trial court's conclusions when reviewing the agency's actions.  (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 939; *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816-817.)

### 2.  Plaintiffs were not prejudiced by the approval procedure

Plaintiffs contend defendant did not follow its own procedure when approving the density bonus.  The project's density bonus was approved by the planning director rather than the city planning department.  Plaintiffs argue the approval in this case violates Los Angeles Municipal Code section 12.22 A.25(g)(2)(i)(b).

Under Los Angeles Municipal Code section 12.22 A.25(g)(2)(i)(b), defendant's planning director is the initial decision maker for a density bonus application.  An exception to this rule occurs when the application is filed as part of a project requiring multiple approvals.  Los Angeles Municipal Code section 12.22 A.25(g)(2)(i)(b) provides in part, "[W]hen the application is filed in conjunction with a subdivision and no other

35

approval, the Advisory Agency shall be the initial decision-maker." There is no procedural irregularity because the planning director acted as the "Advisory Agency" in this instance. The appeal staff report explained, "The Director of Planning acts as both the Advisory Agency and the decision-maker for Director Determination actions."

Even if there was procedural irregularity, plaintiffs have failed to show they were prejudiced by the planning director's approval of the density bonus. Regent Properties, LLC challenged the approvals of the tentative tract map and density bonus by appealing both decisions to the planning commission. Plaintiffs admit they appealed both approvals. But they argue the West Los Angeles Area Planning Commission heard the tentative tract map appeal on January 15, 2014. And they contend the planning commission heard the density bonus appeal on March 13, 2014. Plaintiffs contend they were prejudiced because they were denied the right to comment and provide evidence at a single appeal hearing.

To the contrary, at the March 13, 2014 hearing, the planning commission heard the Regent Properties LLC's appeals as to both the tentative tract map and the density bonus issues. The planning commission heard both appeals because it had jurisdiction for projects requiring multiple approvals pursuant to Los Angeles Municipal Code section 12.36 C.5. Prior to the planning commission's March 13, 2014 hearing, the planning department issued an appeal staff report. The staff report responded to the environmental and density bonus issues raised by plaintiffs in their administrative appeals. The appeal staff report recommended the planning commission deny both appeals. The planning commission subsequently denied plaintiff's appeals in a determination letter dated April 23, 2014. Based on the foregoing, plaintiffs have not demonstrated the density bonus approval by the planning director, rather than the city planning department, was a prejudicial abuse of discretion.

36

### 3. Defendant complied with the density bonus law

Plaintiffs argue the density bonus approval is not supported by substantial evidence. They contend there is no economic analysis to substantiate the planning director's finding that incentives are necessary to provide the financial means to set aside the affordable units. Plaintiffs claim the density bonus approval contravenes Los Angeles Municipal Code section 12.22 A.25 and Government Code section 65915. They assert the ordinance and statute make density bonus and related incentives available unless the concessions are not required in order to provide for affordable housing units.

Plaintiffs' interpretation is contrary to the plain language of Government Code section 65915, subdivision (d)(1)(A) and Los Angeles Municipal Code section 12.22 A.25(g)(2)(i)(c)(i). Government Code section 65915, subdivision (d)(1)(A) mandates, "The city . . . *shall* grant the concession or incentive requested by the applicant *unless* the city . . . makes a written finding, based upon substantial evidence, of any of the following: [¶] (i) The concession or incentive is not required in order to provide for affordable housing costs as defined in Section 50052.5 of the Health and Safety Code, or for rents for the targeted units to be set as specified in subdivision (c)." (Emphasis added.) Likewise, Los Angeles Municipal Code section 12.22 A.25(g)(2)(i)(c)(i) provides, "The Director *shall* approve a Density Bonus and requested incentive(s) *unless* the Director finds that: [¶] (A) The Incentive is not required in order to provide for affordable housing costs , as defined in California Health and Safety Code Section 50052.5, or Section 50053 for rents for the affordable units . . . ." (Italics added.) Neither the statute nor the ordinance requires defendant to make a finding that the density bonus and related incentives are necessary before approving them. Rather, the city *must* grant the incentives *unless* it finds they are unnecessary in order to provide for affordable housing units. Plaintiffs' contrary interpretation, if adopted, would eviscerate the density bonus law's purpose of encouraging and providing incentives to developers to include low and moderate-income housing units. (Gov. Code, § 65913; *Wollmer v. City of Berkeley, supra,* 179 Cal.App.4th at p. 940; *Friends of Lagoon Valley v. City of*

37

*Vacaville, supra,* 154 Cal.App.4th at p. 823; *Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1263 ["[Gov. Code, § 65915] reward[s] a developer who agrees to build a certain percentage of low-income housing with the opportunity to build more residences than would otherwise be permitted by the applicable local regulations."].)

Defendant was mandated by its ordinance and Government Code section 65915 to grant the density bonus because it made no finding that the incentives were unnecessary. Although defendant was not required to make any finding in support of the density bonus approval, its staff explained the incentives were necessary. The January 7, 2013 director's determination letter explains: "The incentives are necessary to provide the financial means and construction scaling to set aside the required number of affordable units and construct the density bonus units. The requested increase in the floor area and building height are necessary to expand the project's building envelope so that the 13 density bonus units being constructed are of equal size, have the same number of bedrooms, and the same amenities and quality that are required to be incorporated into the four (4) set aside units. In addition, the increased height allows the applicant to provide at least one level of grade parking instead of a partial or fully subterranean parking level, thereby decreasing the project's construction costs. It is estimated that one subterranean parking space costs $50,000 per space." Plaintiffs fail to show defendant abused its discretion in approving the density bonus.

## IV.  DISPOSITION

The judgment is affirmed.  Defendants, City of Los Angeles and Montana Bundy, LLC, shall recover their costs on appeal from plaintiffs, Brentwood Stakeholders Alliance for Better Living and Sensible Planning and Regent Properties, LLC.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

KRIEGLER, J.

BAKER, J.